UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SGS U.S. Testing Company, Inc., | Civ. No. 09-6007 (KM) |
| Plaintiff, | |
| v. | OPINION |
| TAKATA CORPORATION, TK HOLDINGS, INC., TAKATA, INC., TAKATA RESTRAINT SYSTEMS, INC., TAKATA SEAT BELTS, INC., TK-TAITO, LLC, and JOHN DOE COMPANIES (1-50), | |
| Defendants. | |

## MCNULTY, District Judge

The plaintiff, SGS U.S. Testing Company (formerly U.S. Testing Company, or USTC), tested seatbelts for the defendants, Takata Corporation and its affiliates (collectively, "Takata"). Multiple lawsuits were brought against either or both, claiming that the testing was inadequate and the seatbelts substandard. None of the lawsuits were successful. SGS seeks from Takata indemnification of the costs of defense of those actions. District Judge Dennis M. Cavanaugh granted summary judgment to Takata on Count II of the complaint (common law indemnity), and he also dismissed Count I (breach of contract) and Count III (breach of the implied covenant of good faith and fair dealing) for failure to state a claim. The United States Court of Appeals for the Third Circuit affirmed summary judgment for defendant on Count II, but reversed the dismissals of Counts I and III, and remanded for further proceedings. (ECF nos. 94, 94-1) After Judge Cavanaugh's retirement, the matter was reassigned to me. (ECF no. 103)

1

Now before the Court are cross-motions of Takata (ECF no. 121) and SGS (ECF no. 122), pursuant to Fed. R. Civ. P. 56, for summary judgment on the remaining counts, Counts I and III. For the reasons expressed herein, the motion of Takata will be conditionally granted, and the motion of SGS will be conditionally denied, reserving only the apportionment issue, as provided in Section III.A.4, *infra*.

## I.   Background[1]

SGS is an independent testing laboratory. From 1985 through 2002, SGS contracted with Takata, a seatbelt manufacturer, to perform representative sample safety tests under Federal Motor Vehicle Safety Standard 209 ("FMVSS 209"). Among the items tested were samples of Takata's TI-22 series ejector spring buckle. (PSMF ¶¶ 1–6, DSMF ¶¶1–7) As relevant here, the SGS testers would perform a "partial engagement" test. That is, they would attempt to induce a "false latch," a condition wherein the belt appears to be fully latched, but is not. (DSMF ¶¶ 14, 15) In such a case, the testers would measure the "release force" required to disengage the buckle. (DSMF ¶ 17)

The fee for each test was in the range of $2000 to $2500. Each time SGS undertook to perform testing for Takata, it issued an order form, containing "Terms and Conditions" which evolved over time. (PSMF ¶ 8)

---

[1]     Herein, citations to the record are abbreviated as follows:

DSMF =     Defendant Takata's Statement of Material Facts, ECF no. 121-1
PR=        Plaintiff  SGS's response to DSMF, ECF no. 125-1
PSMF =     Plaintiff SGS's Statement of Material Facts, ECF no. 122-1
DR=        Defendant Takata's response to PSMF, ECF no. 127
PASMF =    Plaintiff SGS's Additional Statement of Material Facts, ECF no. 125-2
DAR=       Defendant Takata's additional response to PASMF, ECF no. 129
3d Cir. Op. = Slip Opinion of U.S. Court of Appeals for the Third Circuit, No. 12–3284, 547 F. App'x 147, 2013 WL 6172550 (3d Cir. Nov. 26, 2013) (copy filed on district court docket at ECF no. 94-1)

The 1986 Terms and Conditions contained the following indemnification provision:

> [Takata] agrees, in consideration of [SGS's] undertaking to perform the test program hereunder, to protect, defend, indemnify, save harmless and exonerate [SGS] from any and all claims, damages, expenses either direct or consequential for injuries to persons or property arising out of or in consequence of the performance of the testing or inspections hereunder and/or the performance of the products tested or inspected hereunder.

(PSMF ¶ 9)

The 1995 Terms and Conditions contained the following indemnification provision:

> [Takata] AGREES, IN CONSIDERATION OF SGS USTC UNDERTAKING TO PERFORM THE TEST(S) OR PROGRAM HEREUNDER, TO PROTECT, DEFEND, INDEMNIFY, SAVE HARMLESS AND EXONERATE SGS USTC FROM ANY AND ALL CLAIMS, DAMAGES, EXPENSES EITHER DIRECT OR CONSEQUENTIAL FOR INJURIES TO PERSONS OR PROPERTY ARISING OUT OF OR IN CONSEQUENCE OF THE PERFORMANCE OF THE TESTING OR INSPECTIONS HEREUNDER AND/OR THE PERFORMANCE OF THE PRODUCTS TESTED OR INSPECTED HEREUNDER UNLESS CAUSED BY THE NEGLIGENCE OF USTC.

(PSMF ¶ 10)

The 2000 Terms and Conditions contained the following indemnification provision:

> THE CLIENT [Takata] SHALL GUARANTEE, HOLD HARMLESS AND INDEMNIFY THE COMPANY [SGS] AND ITS OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS AGAINST ALL CLAIMS MADE BY ANY THIRD PARTY OR LOSS DAMAGE OR EXPENSE OF WHATSOEVER NATURE INCLUDING REASONABLE LEGAL EXPENSES AND HOWSOEVER ARISING RELATING TO THE PERFORMANCE, PURPORTED PERFORMANCE OR NON-PERFORMANCE, OF ANY SERVICES TO THE EXTENT THAT THE AGGREGATE OF ANY SUCH CLAIMS RELATING TO ANY ONE SERVICE EXCEED THE LIMIT MENTIONED IN CONDITION 9 [relating to fee paid by Takata to SGS].

(PSMF ¶ 11)

3

Starting in 2002, six actions were filed[2] concerning SGS's testing of seatbelt assemblies, particularly the "partial engagement test." (DSMF ¶ 4) In those class actions, the plaintiffs essentially claimed that the partial engagement test was required by FMVSS 209, but that SGS stopped performing it because the Takata belts could not pass, and then falsified results. Those results were allegedly passed back to Takata, which passed them along to the auto makers that purchased the belts. (DSMF ¶¶ 28–42)

SGS tendered written requests for indemnification and defense at or near the time the actions were filed. (PSMF ¶¶ 18, 19; DR ¶¶ 18, 19) Takata declined, in letters stating, *inter alia,* that the parties' agreements did not require it to indemnify SGS for SGS's own intentional or negligent acts. (PSMF ¶ 20; DR ¶ 20) SGS therefore conducted its own defense. (PSMF ¶ 22; DR ¶ 22)

Takata alleges that the genesis of the claims lay in the deposition testimony of SGS employees. (DSMF, PR ¶¶ 11–24) Particularly pertinent was the testimony of Frank Pepe, Director of Standard Testing and Material Evaluation for SGS. Pepe stated that a 1986 recorded release result of one half pound signified a false latch, and an actual release force of one half pound. (DSMF, PR ¶¶ 13–16) Then, in the 1990s, SGS allegedly stopped performing the test. (*E.g.,* DSMF, PR ¶¶ 24–25, 39) Takata and SGS appear to agree that this was a misinterpretation; what happened was that, when a false latch was *not*

---

[2]    They were:

Zavala v. Takata Corp., No. BC277327 (Super. Ct., Los Angeles Cty., CA)

*Fernandez v. Takata Corp.,* No. CCV2002-010887 (Super. Ct., Maricopa Cty., AZ)

*Baggett d/b/a American Motors v. Takata Corp.,*  No. 3594 (28th Judicial Circuit, Haywood Cty., TN)

*Lohman v. Takata Corp.,* No. D-101-CV-2002021279 (First Judicial Dist. Ct., Santa Fe, NM)

*Price v. Takata Corp.,* No. 2:08-CV-00151-J (N.D. Tex.)

*Stevic v. Nissan Motor Co., Ltd.,* No. 2006-CA-008631-0 (Super. Ct., Orange Cty., CA)

(DSMF ¶¶ 28–36)

achieved, the technicians would make a nominal entry of one half pound, because the Department of Transportation would not accept "not applicable." (DSMF, PR ¶¶ 20–23)

The allegations focus primarily on one class action, *Zavala*, which went to a bench trial (DSMF, PR ¶¶ 28, 29, 37–49) The judge entered a decision absolving Takata and SGS of all liability. (ECF no. 75-24; DSMF, PR ¶ 52).

In *Fernandez*, Takata and SGS were initially named as defendants, but eventually dismissed. In *Lohman*, Takata was never served, and the case was eventually dismissed against SGS. (DSMF, PR ¶ 52 n.5)

In the remaining actions, SGS was not named as a defendant, although some included allegations regarding its testing. *Price*, an action by an individual, went to trial, ending with a jury verdict in favor of Takata and an automobile manufacturer. (ECF no. 75-26) In *Stevic*, all claims against Takata and an automobile manufacturer were dismissed for lack of standing. (ECF no. 75-28) *Baggett* resulted in a voluntary dismissal as against Takata. (ECF no. 75-25)

In short, the defense of all of these actions was entirely successful. Neither SGS nor Takata was found negligent or held liable. (PSMF ¶ 26; DR ¶ 26) That success, at least in some cases, required SGS to defend itself factually, by introducing evidence that it had not skipped required tests and had not falsely reported results. (*See* DSMF, PR ¶¶ 38–49)

## II.  Governing Standards

### A.   Rule 56 Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

In determining whether there is a "dispute as to any material fact," a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

**B.    Governing Substantive Law as Stated by the Third Circuit**

In determining whether a party is "entitled to judgment as a matter of law" in this diversity case, I must apply State substantive law. *See generally Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817 (1938). That requires me to determine how the State's highest court has decided, or predict how it would decide, the applicable legal issues. Of course, a decision on point by the New Jersey Supreme Court would be most pertinent. *See Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 220-21 (3d Cir. 2008).

> But "in the absence of guidance from the state's highest court, [I] must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would determine the issue at hand."

*Norfolk Southern Ry. Co. v. Basell USA Inc.,* 512 F.3d 86, 92 (3d Cir. 2008) (quoting *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1445 (3d Cir. 1996)); *see also West v. AT&T Co.,* 311 U.S. 223, 237 (1940); *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 424 (3d Cir. 2007).

I am not, however, writing on a clean slate. The U.S. Court of Appeals for the Third Circuit has stated the substantive principles of law that apply to the remaining contractual claims, Counts I and III. I am bound by the Third Circuit's statement of the law that should govern the proceedings on remand:

> SGS's first argument is that it has a valid claim for contractual indemnification....
>
> In exchange for SGS's testing services, Takata agreed to indemnify SGS. Indeed, the parties executed several contracts with various indemnification provisions over the years. New Jersey's indemnification law distinguishes between vicarious-liability and independent-fault cases. *Mantilla v. NC Mall Assocs.,* 167 N.J. 262, 770 A.2d 1144, 1149 (2001). In *Mantilla,* the Court "adopt[ed] the 'after-the-fact' approach" to determine whether a party has defended against allegations of its independent fault. *Id.* at 1149, 1151 (citing *Cent. Motor Parts Corp. v. E.I. duPont deNemours & Co.,* 251 N.J. Super. 5, 596 A.2d 759 (1991)). This approach "permits an indemnitee to recover counsel fees if the indemnitee is

7

adjudicated to be free from active wrongdoing regarding the plaintiff's injury, and has tendered the defense to the indemnitor at the start of the litigation." *Id.* at 1151 (citing *Cent. Motor Parts Corp.*, 596 A.2d at 759). This does not mean that an indemnitee is automatically entitled to an award for the costs of defense. Rather, as *Kieffer v. Best Buy*, 205 N.J. 213, 14 A.3d 737 (2011), demonstrates, when the indemnitee has been adjudged free of any wrongdoing, the ability to recover depends upon the language of the contract. *Id.* at 743–44 & n. 6 (concluding that adjudication that owner, contractor and subcontractor were not negligent entitled indemnitee owner to indemnification based on expansive language indemnifying it from "any and all" claims, but that indemnitee contractor was not entitled to indemnification for costs of defense since contract with subcontractor required judicial finding of negligence by subcontractor). If application of the after-the-fact approach establishes that an indemnitee "has been found to be at least partially at fault," then the indemnitee "may not recover the costs of its defense from an indemnitor" unless there is explicit language in the indemnity contract. *Mantilla,* 770 A.2d at 1145.

Employing the "after-the-fact" approach here, it is evident that the complaint alleged that SGS, as indemnitee, was adjudicated free of wrongdoing and that it tendered the defense to Takata, the indemnitor, at the outset of the litigation. See JA. 442 (¶¶ 14–24). SGS, therefore, may be entitled to recover its defense costs depending upon the language of the various indemnity contracts. *See Mantilla,* 770 A.2d at 1151, *Kieffer,* 14 A.3d at 743–44. Accordingly, we conclude that the allegations in SGS's complaint were sufficient to state a claim for indemnification under New Jersey law and that the District Court erred by dismissing the claim.

We note, however, that in New Jersey "[an] indemnitee may recover only those fees and expenses attributable to the making of defenses which are not primarily directed toward rebutting charges of active negligence." *Central Motor Parts Corp.,* 596 A.2d at 762 (quoting *Piedmont Equip. Co. v. Eberhard Mfg. Co.,* 99 Nev. 523, 665 P.2d 256, 258–259 (1983)). *See also Piedmont,* 665 P.2d at 260 (holding that an indemnitee who was "exonerated of liability at trial" was, nonetheless, only entitled to recover expenses not directed at rebutting charges of active negligence.) In this case, SGS incurred substantial expenses defending its testing methodology. On remand, the District Court will need to consider whether, in light of the language of the indemnification provisions, these expenses should be excluded from any recovery.

SGS's second argument is that it also has a valid claim for breach of the duty of good faith and fair dealing. This duty "is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 773 A.2d 1121, 1126 (2001). Conduct that is contrary to "community standards of decency, fairness or reasonableness" violates the duty. *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)); *see also id.* at 1130 ("Bad motive or intention is essential."). The District Court dismissed this claim because it concluded that SGS did not have a valid "claim for contractual indemnification." JA. 16. As explained, that conclusion was wrong and the claim should not have been dismissed.

(3d Cir. Op. at 3–4, 547 F. App'x at 148–49)

## III.   DISCUSSION

### A.   Count I: Breach of contract

As I read the Court of Appeals decision, quoted above, New Jersey law provides for contractual indemnification of defense costs if the indemnitee is adjudicated to be free of wrongdoing. Those costs must, however, be apportioned; costs incurred in rebutting charges of the indemnitee's own active negligence are excluded. All of the foregoing principles, however, may be abrogated by contract; the parties' agreement, if sufficiently clear and explicit, may broaden or narrow the scope of indemnification.

On Count I (breach of contract), then, the issues on remand are three:

1.   *Eligibility*: Did the summary judgment record bear out what the Third Circuit held was adequately alleged in the complaint: *i.e.*, that, from an after-the-fact perspective, "SGS, as indemnitee, was adjudicated free of wrongdoing and that it tendered the defense to Takata, the indemnitor, at the outset of the litigation"?

2.   *Apportionment*: If so, is indemnification of any portion of SGS's costs excluded by the rule against indemnification of the indemnitee's costs of rebutting charges of its own "active negligence"?

3.   *Contract*: If so, is SGS nevertheless "entitled to recover its defense costs [based] upon the language of the various indemnity contracts"?

A party will not be indemnified for its own negligence or fault, absent a very clear and explicit agreement. That fundamental principle runs through all of the indemnification case law. Accordingly, the law of New Jersey, synthesized in the opinion of the Court of Appeals, injects similar factors—the indemnitee's level of fault, the language of the indemnification agreement—at more than one step of the analysis. The step 1 requirement that the indemnitee be adjudicated to be free of negligence, for example, is phrased similarly to, but interpreted differently from, the step 2 exclusion of indemnification for costs of rebutting charges of active negligence—and both may be overridden by sufficiently clear contractual language. The result is concededly disorienting,[3] and it is perhaps unsurprising that the parties in this case are talking past each other. One fundamental disagreement concerns whether the "after-the-fact" approach applies only to the step 1 issue, or whether it applies to step 2 as well. And always lurking is the question whether the parties nevertheless have contracted for a contrary result.

What is clear, contrary to certain oversimplifications, is that New Jersey does not collapse the analysis into any single question: *e.g.*, whether negligence was alleged, or whether SGS prevailed, or whether the contract calls for indemnity. Accordingly, neither did the Third Circuit, and neither will I. I consider the three steps in order.[4]

## 1.   *Eligibility*: Tender of defense/Adjudication of no fault

The first prerequisite—SGS's demand for defense and indemnity— is not in issue. SGS has placed in evidence the letters by which it demanded defense

---

[3]     As in "If we had a little ham we could have some ham and eggs, if we had eggs." Carl Sandburg, *The People, Yes* #31 (Harcourt Brace & Co. 1936) (apparently quoting a vernacular saying).

[4]     For purposes of the first two steps, I assume *arguendo* that the agreements provide for indemnification; whether they do so with the required clarity is discussed at step 3.

and indemnification, as well as Takata's written denials. Takata admits that these are genuine.

As to the second prerequisite—that SGS was adjudicated to be free of wrongdoing— the Third Circuit extracted from the New Jersey case law an "after-the-fact approach." 3d Cir. Op. at 3; *see also Starbucks Corp. v. Wellshire Farms, Inc.*, Civ. No. 14-4001, 2016 WL 845140 at *4 (D.N.J. March 4, 2016) (Hillman, J.) ("That [after-the-fact] approach was devised in the context of determining whether an indemnitee could recover counsel fees 'so long as the indemnitee is free from active wrongdoing regarding the injury to the plaintiff and has tendered the defense to the indemnitor at the start of the litigation.'").

It is uncontested that SGS, like Takata, was adjudicated to be free of wrongdoing. The "after-the-fact" approach dictates that I examine, not just the allegations, but the outcome of the cases against SGS and Takata. Not surprisingly, they agree that they are wholly blameless. They have submitted the relevant verdicts and opinions demonstrating that neither SGS nor Takata was ever found negligent or liable in any of the cases. Thus SGS was not found to be even "partially at fault"; it "was adjudicated free of wrongdoing." (3d Cir. Op. at 3–4)

To explore the significance of that issue, however, it is necessary to briefly consider the background of the "after-the-fact" approach. As the Third Circuit pointed out, it has its roots in New Jersey's division between indemnification for vicarious-liability and independent-fault cases. (3d Cir. Op. at 3 (citing *Mantilla,* 770 A.2d at 1149))

Even at common law, indemnification for liability that is completely vicarious is permitted. 770 A.2d at 1149 (citing *Central Motor Parts Corp.*, 596 A.2d at 761). That is, where A is forced to answer for B's fault, then B may freely agree to indemnify A.

By contrast, however, cases involving *A's own* fault are indemnity-ineligible. That is to say that costs will not reimbursed as to an "indemnitee who has defended against allegations of its independent fault." *Id.* For purposes

of that disqualification, "defended against allegations" does not really mean that at all; it turns out to be a term of art, meaning, roughly, "defended itself *successfully.*" It is to this issue that the "after-the-fact approach" applies. The "[a]llegations in the pleadings may be a starting point to determine whether counsel fees and costs are recoverable by [an indemnitee], but the actual facts developed during trial should control" *Mantilla,* 770 A.2d at 1150 (quoting *Piedmont Equip.,* 665 P.2d at 258–59 (citing *Pender v. Skillcraft Indus.,* 358 S. 2d 45, 46 (Fla. Dist. Ct. App. 1978)).

The outcome of the case is therefore the clincher: indemnity is ruled out unless the indemnitee party was "*adjudicated* free of wrongdoing." (3d Cir. Op. at 3 (quoting *Mantilla,* 770 A.2d at 1151) Phrasing the proposition in the negative, *Mantilla* held that, absent explicit contractual language to the contrary, "an indemnitee who has been found to be at least partially at fault may not recover the costs of its defense from an indemnitor." 770 A.2d at 1145. Thus, in *Mantilla,* a would-be indemnitee, PBS, was found 40% liable, and the Court ruled that PBS was therefore ineligible for indemnification.

SGS's indemnity claims have surmounted this initial threshold. SGS tendered its defense to Takata and, as it turned out, was "adjudicated" to be free of any liability—*i.e.,* in the underlying cases, SGS was not found to be even "partially at fault." *Id.* Under such circumstances, said the Third Circuit, the independent-fault disqualification does not rule out indemnification: "SGS may be entitled to recover its defense costs depending upon the language of the various indemnity contracts." (3d Cir. Op. at 4)

## 2. *Apportionment:* "Active negligence" rule

Takata's main contention is that New Jersey law does not permit indemnification of costs to the extent that SGS, in the underlying actions, was "rebutting charges of active negligence." That active-negligence limitation does not rule out indemnification, but it may require apportionment.[5]

---

[5]     Much of the confusion seems to lie here. Step 1's "defending against allegations," despite appearances, is not synonymous with step 2's "rebutting charges." As noted above, at step 1, it is a term of art; viewed after the fact, it

Having held that the complaint passed step 1 and stated a claim for indemnification, the Court of Appeals stated a major caveat:

> We note, however, that in New Jersey "[an] indemnitee may recover only those fees and expenses attributable to the making of defenses which are not primarily directed toward rebutting charges of active negligence." *Central Motor Parts Corp.*, 596 A.2d at 762 (quoting *Piedmont Equip. Co. v. Eberhard Mfg. Co.*, 99 Nev. 523, 665 P.2d 256, 258–259 (1983)).

(3d Cir. Op. at 4–5).

Critical to the analysis is the Third Circuit's deliberate invocation of the *Piedmont* case upon which the New Jersey state courts based their analysis. Immediately after the quoted passage, the Court of Appeals added the following citation and quotation:

> *See also Piedmont*, 665 P.2d at 260 (holding that an indemnitee who was "exonerated of liability at trial" was, nonetheless, only entitled to recover expenses not directed at rebutting charges of active negligence.)

(3d Cir. Op. at 5).

Thus the Court of Appeals specifically cited *Piedmont* (which was relied on by both *Central Motor* and *Mantilla*) for the proposition that the "active negligence" apportionment principle applies even where the indemnitee was ultimately "exonerated of liability at trial." (3d Cir. Op. at 5). The clear implication is that the "after-the-fact" approach of step 1 does not extend to step 2. The step 2 "active negligence" apportionment rule looks, not to the outcome of the case ("exoneration"), but to the nature of the claims ("charges") that the indemnitee was rebutting. Where a party has been cleared of wrongdoing, it is generally *eligible* for indemnification of defense costs, but *only*

---

essentially requires that the *outcome* be *wholly* in the indemnitee's favor. Once step 1 eligibility is established, step 2 requires that the "charges" or allegations be sorted in order to apportion liability for costs.

The distinction between ineligibility and apportionment, too, is less immediately apparent here, because Takata claims that *none* of SGS's costs are compensable (*i.e.*, that the "apportionment" is on a 0/100 basis).

*insofar as* those costs were incurred in "the making of defenses which are not primarily directed toward rebutting charges of active negligence." *Id*.[6]

Why such a rule? It is important to keep in mind that we are adjusting rights, not between plaintiff and defendant, but between Defendant #1 and Defendant #2. As to the plaintiff who asserted a meritless claim that Defendant #1 was negligent, the equities are clear enough, and yet under the American Rule Defendant #1 will ordinarily bear its own litigation expenses. By hypothesis, the party who caused that needless expenditure was not Defendant #2, but the overreaching plaintiff. In such a case, the default apportionment rule limits the shifting of expenses between the defendants.[7]

Indemnity, then, is permissible only to the extent that SGS incurred expenses for activities *not* directed at rebutting charges of its own active negligence. In other words, as I read the Third Circuit's remand, the expenses will have to be apportioned:

> In this case, SGS incurred substantial expenses defending its testing methodology. On remand, the District Court will need to consider whether, in light of the language of the indemnification provisions, these expenses should be excluded from any recovery.

(3d Cir. Op. at 5) SGS may be indemnified, but only to the extent of expenses of it incurred rebutting claims other than those of SGS's active negligence.

There is, however, one important caveat.

---

[6]    The awkwardness here is that *Central Motor* and *Mantilla* were not nearly so explicit as the Third Circuit in separating step 1 eligibility from step 2 apportionment. That division is most clearly expressed in *Piedmont*, the Nevada case relied upon by both. Neither *Central Motor* nor *Mantilla*, however, cited the particular language from *Piedmont*, quoted by the Third Circuit, to the effect that step 2 apportionment would be appropriate even where the indemnitee was "exonerated of liability at trial." *See Piedmont*, 665 P.2d at 260.

[7]    In contrast, recall that vicarious liability—*i.e.*, liability of Defendant #1 based on the alleged wrongdoing of Defendant #2—is treated separately. In such a case, Defendant #1's need to mount a defense is clearly attributable to Defendant #2, and indemnity is freely permitted.

### 3.    *Contract*: Explicit and unequivocal language

Step 1 and step 2 are both subject to the larger principle that the parties may contract for a contrary result. The step 1 "independent fault" disqualification, for example, is a "default rule" that applies "absent explicit contractual language to the contrary." *Mantilla,* 770 A.2d at 1145. The step 2 "active negligence" apportionment rule likewise must be applied "in light of the language of the indemnification provisions," and the Third Circuit has directed that I do so on remand. (3d Cir. Op. at 5)

Contract is king. Parties are free, within broad limits, to allocate risks of future events, including litigation. Now if they could dicker forever at no cost, they could hypothetically arrive at agreements that allocate all risks for every possible contingency. But we do not live in such a world. Courts have therefore developed "gap-fillers"—"default rules" to decide cases not covered by explicit contractual language. Such off-the-rack rules are designed to be reasonable in a majority of cases, but where the case is covered by tailor-made contractual language, that contractual language will control. What that means in practice is that the parties may contract around the active-negligence apportionment rule.

How specific must such a contractual work-around be? The rules for interpreting indemnity agreements provide some guidance. A commercial contract of indemnity is a valid, even salutary means of allocating risk. *See Ramos v. Browning Ferris Industries,* 510 A.2d 1152, 1158–59 (N.J. 1986); *Stier v. Shop Rite of Manalapan,* 492 A.2d 1055, 1058–59 (N.J. Super. Ct. App. Div. 1985). In the main, such a contract is interpreted like any other: primarily in terms of its plain, unambiguous language, considered in light of its essential purpose and the object the parties were trying to achieve. *Kieffer v. Best Buy,* 14 A.3d 737, 742–43 (N.J. 2011); *Vitty v. D.C.P. Corp.,* 633 A.2d 1040, 1043 (N.J. Super. Ct. App. Div. 1993).

A special rule of interpretation applies to contracts of indemnity, however. In cases of ambiguity, the contract will be "strictly construed against

the indemnitee." *Kieffer,* 14 A.3d at 743 (quoting *Mantilla,* 770 A.2d at 1151). That principle suggests that contractual language in derogation of the step 1 and 2 default rules must be "explicit," *see Mantilla,* 770 A.2d at 1152, or "unequivocal," *see Ramos,* 510 A.2d at 1159.

I turn to the language of the indemnification provisions, quoted in full above. That language evolved from 1985 through 2002, but throughout it remained quite broad.

In 1985, it required indemnification of "any and all claims, damages, expenses either direct or consequential for injuries to persons or property arising out of or in consequence of the performance of the testing or inspections hereunder and/or the performance" of the seat belts. The 1995 version contained exactly the same language (albeit in capital letters), but added the proviso "UNLESS CAUSED BY THE NEGLIGENCE OF USTC." The 2000 version covered "ALL CLAIMS MADE BY ANY THIRD PARTY OR LOSS DAMAGE OR EXPENSE OF WHATSOEVER NATURE INCLUDING REASONABLE LEGAL EXPENSES AND HOWSOEVER ARISING RELATING TO THE PERFORMANCE, PURPORTED PERFORMANCE OR NON-PERFORMANCE, OF ANY SERVICES."[8]

As to subject matter, these indemnity provisions apply to claims or expenses "arising out of" (or even more broadly, "HOWSOEVER ARISING RELATING TO") the seatbelt testing under the contract. Courts interpreting such "arising out of" language have given it broad scope. *Vitty,* for example, held that "the words 'arising out of' should be construed in accordance with the common and ordinary meaning as referring to a claim 'growing out of' or having its 'origin in' the subject matter of the ... agreement...." 633 A.2d at 1043.

As to the kinds of expenses that are compensable, it seems that legal fees and expenses would comfortably fit within the indemnity provisions' broad language. The 1985/90 provisions encompasses "any and all claims [or]

---

[8]     The 2000 version provides for indemnification only to the extent that such expenses exceed the fee Takata paid to SGS.

expenses." The 2000 version more specifically covers "DAMAGE OR EXPENSE OF WHATSOEVER NATURE INCLUDING REASONABLE LEGAL EXPENSES" (2000).

So, to be sure, the contractual language is broad. But "broad" does not equate to "explicit" and "unequivocal." In the context of a claim for indemnity in derogation of the default rules stated above, the contract must be not just broad but specific. In *Azurak v. Corporate Property Investors*, 814 A.2d 600 (N.J. 2003), for example, the indemnity provision in a contract for janitorial services at a shopping mall covered "any claim … or expense (including attorneys' fees)," and it extended to matters "relating to, arising out of or existing by reason of Contractor's performance of this Agreement or the conditions created thereby …." *Id.* at 600. Sued for a slip and fall, the mall was found 30% responsible and sought indemnification. Affirming the Appellate Division, the Supreme Court agreed that "the cited language of the indemnification provision was neither explicit nor unequivocal on the subject of the indemnitee's negligence, thus falling short of the standard we established in [*Ramos, supra,* and *Mantilla, supra.*] *Id.* at 601. The Court approvingly cited the Appellate Division's reliance on the "absence of clear and explicit language addressing indemnification for the Mall's negligence." *Id.*

It was not enough, said *Azurak,* that the indemnity provision, which covered any claims arising out of the contract's subject matter, was "broad." Former case law giving comprehensive effect to such a "broad form" indemnity, *Azurak* held, had been "implicitly overruled by *Ramos* and *Mantilla.*" *Id.* [9] "In

---

[9]     The reference is to *Doloughty v. Blanchard Const. Co.*, 352 A.2d 613 (Law Div. 1976), a case that has been impliedly overruled by *Ramos* and *Mantilla. Azurak*, 814 A.2d at 600–01.

        *Leitao v. Damon G. Douglas Co.*, 693 A.2d 1209, 1212 (N.J. Super. Ct. App. Div. 1997), cited by SGS, is questionable at best, because it rests squarely on the authority of the overruled *Doloughty* case. In addition, *Leitao* relies on the *Doloughty*-derived rationale that in a construction case, the indemnity contracts really serve the function of allocating coverage among the parties' insurers. *Id.* (citing, *e.g., The Pep Boys v. Cigna Indem. Ins. Co. of N. America*, 692 A.2d 546, 549 (N.J. Super. Ct. App. Div. 1997) (insurance case); *Harrah's Atlantic City, Inc. v. Harleysville Ins. Co.*, 671 A.2d 1122, 1124 (N.J. Super. Ct. App. Div. 1996) (insurance case)). Contrary to contracts of

order to allay even the slightest doubt on the issue of what is required to bring a negligent indemnitee within an indemnification agreement we reiterate that the agreement must specifically reference the negligence or fault of the indemnitee." *Id.*

To be sure, the cited cases are speaking primarily of the step 1 eligibility analysis. But the concerns of step 2, like those of step 1, are bound up in the default rule barring indemnification for the indemnitee's own negligence. And although the step 2 rule, too, can be overruled contractually, such contractual language must be similarly explicit.

I find broad language, but not clear and explicit language, in the SGS/Takata indemnification provisions. They mention negligence only once: in the 2000 version, indemnification is *excluded* for expenses "CAUSED BY THE NEGLIGENCE OF USTC." These indemnification provisions do not specifically refer to indemnification of the costs of defense of claims (however unsuccessful) that SGS was actively negligent.

The contractual language, then, does not take us out of the realm of the "default rules." In other words, we remain where we were at the close of Section III.A.2, *supra.* Under the step 2 apportionment rule, SGS may be indemnified only for expenses of defending claims apart from those alleging that SGS was actively negligent.

### 4. Apportionment

Takata has submitted suggestive evidence that the claims SGS litigated in the underlying actions were all claims of wrongdoing by SGS. SGS has submitted other materials suggesting that it was, at least at times, defending Takata's actions. What I do not have before me is an apportionment analysis: a statement of SGS's claimed expenses, and an analysis of the portions that were and were not devoted to rebutting charges that SGS was actively negligent.

---

indemnity, insurance contracts are generally construed liberally in favor of the insured.

To some degree, the omission is understandable. The parties simply disagreed on the applicable legal standard, and the scope or even relevance of apportionment evidence depended on that standard.

Out of caution, then, I will permit (but not require) SGS, within 21 days, to make a supplemental submission, not to exceed 10 pages. In that submission, SGS should assume for purposes of argument that my apportionment analysis governs, and should establish how indemnification of its expenses would be apportioned thereunder. Within 21 days thereafter, Takata may, if it wishes, respond with a 10-page submission. No reply is authorized.

## B.   Count III: Implied Covenant of Good Faith and Fair Dealing

Breach of the implied covenant of good faith and fair dealing is a separate claim, with different elements. Nevertheless, the foregoing analysis implies that summary judgment must be granted to Takata on Count III, as well.

> "'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" [*Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 245, 773 A.2d 1121 (2001)] (quoting *Restatement (Second) of Contracts, supra,* § 205 comment a). The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing "anything which will have the effect of destroying or injuring the right of the other party to receive" the benefits of the contract. *Palisades Props., Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965) (internal quotations omitted); *see also Wade v. Kessler Institute*, 172 N.J. 327, 340, 798 A.2d 1251 (2002) (same). Proof of "bad motive or intention" is vital to an action for breach of the covenant. *Wilson, supra,* 168 N.J. at 251, 773 A.2d 1121. The party claiming a breach of the covenant of good faith and fair dealing "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Williston, supra,* § 63:22, at 513–14 (footnotes omitted); *see also Wilson, supra,* 168 N.J. at 251, 773 A.2d 1121; [*Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420, 690 A.2d 575 (1997)]

19

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Associates*, 864
A.2d 387, 396 (N.J. 2005).

The bad faith here, according to SGS, lay in the decision of Takata's
counsel to deny SGS's requests for defense and indemnity. SGS suggests that
counsel's decision was based, not on the language of the agreements, but on
strategic considerations. From quoted deposition testimony, an inference could
plausibly be drawn that counsel sought to give SGS an incentive to participate
actively in the defense and to avoid bad testimony by its employees. Counsel
added (to paraphrase) that if Takata had defended but reserved rights under
the indemnity, it would have been placed in the position of chasing SGS for the
money in the event of an unfavorable result. (ECF no. 122-3 at 3)

I will make the SGS-friendly assumption, for purposes of argument, that
this deposition testimony could be evidence of bad faith. But bad faith, though
"vital," *id.,* is not sufficient. Breach of the implied covenant of good faith and
fair dealing requires that a party, here SGS, was deprived of its "justified
expectations," and was "denied the benefit of the bargain originally intended by
the parties." *Id.* I have held that SGS was not entitled to indemnification for
costs of rebutting charges of its own active negligence. It follows that Takata,
whether in good or bad faith, did not deprive SGS of the benefit of the bargain
the parties made.

Should SGS's supplemental submission persuade me, however, that it
was denied a substantial portion of the benefit of the contract, it may be
necessary to revisit this aspect of my ruling.

## CONCLUSION

For the reasons stated above, the summary judgment motion of Takata (ECF no. 121) is CONDITIONALLY GRANTED, and that of SGS (ECF no. 122) is CONDITIONALLY DENIED, subject to the supplemental submissions authorized in Section III.A.4, *supra*. In accordance with the accompanying Order, if no such submission is received, this order will become final; if supplemental submissions are received, I will rule as to any apportionment issues that remain.

An appropriate Order accompanies this opinion.

Dated: April 6, 2016

KEVIN MCNULTY
United States District Judge