# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**SGS U.S. Testing Company, Inc.,**

**Plaintiff,**

**v.**

**TAKATA CORPORATION, TK HOLDINGS, INC., TAKATA, INC., TAKATA RESTRAINT SYSTEMS, INC., TAKATA SEAT BELTS, INC., TK-TAITO, LLC, and JOHN DOE COMPANIES (1-50),**

**Defendants.**

Civ. No. 09-6007 (KM)

**OPINION**

## MCNULTY, District Judge

The plaintiff, SGS U.S. Testing Company ("SGS"),[1] tested seatbelts for the defendants, Takata Corporation and affiliates (collectively, "Takata"). Both were sued based on theories that the testing was inadequate or the seatbelts substandard. None of the lawsuits were successful. SGS, having tendered defense of the lawsuits to Takata, now seeks contractual indemnification of the costs of defense of seven of those actions (collectively, the "Lawsuits").[2]

---

[1] Herein, the designation "SGS" shall refer to the plaintiff and its predecessor entity (U.S. Testing Company, or USTC).

[2] The seven Lawsuits were:

1. *Eleanora Fernandez, et al v. Takata Corp., SGS U.S. Testing Company, Inc., et al* (Arizona) - Superior Court of Arizona, County of Maricopa, Case No. CV 2002-022227, and its predecessor case, same title same court, CV 2002-010887, a class action suit hereinafter referred to as "*Fernandez*".

2. *Lohman, M.D., et al vs. Takata Corp., SGS U.S. Testing Company, Inc., et al* (New Mexico) – 1st Judicial District Court, County of Santa Fe, New Mexico, Case No. D-0101-CV-200201279., a class action suit hereinafter referred to as "*Lohman*"

In an opinion and order dated April 6, 2016 (ECF nos. 136, 137)[3] on remand from the U.S. Court of Appeals for the Third Circuit, this Court ruled on the cross-motions of Takata (ECF no. 121) and SGS (ECF no. 122) for summary judgment on the  remaining counts. Relevant now is the Court's ruling on Count I (breach of contract) that, pursuant to the parties' indemnity contracts, SGS is entitled to recover from Takata some, though not necessarily all, costs of defending the Lawsuits.

I write primarily for the parties, and familiarity with my prior opinion is assumed. My ruling on the parties' summary judgment motions set forth legal conclusions and rationales governing apportionment. The parties had not given the Court sufficient information, however, to actually apportion costs. I therefore permitted SGS to make a supplemental submission stating how indemnification of SGS's expenses should be apportioned, and I authorized Takata to respond. Both parties made supplemental submissions as directed. (ECF nos. 139, 140)

---

3. *Lupe Zavala and Rosalie Zavala, Individually and On Behalf of all Similarly Situated Persons, vs. Takata Corp., United States Testing Company, Inc., et al* (California) - Superior Court of California, County of Los Angeles, Case No. BC 277327, a class action suit hereinafter referred to as "*Zavala*"

4. *Travis and Galen Baggett d/b/a American Motors v. Takata Corp., SGS U.S. Testing Company, Inc., et al* (Tennessee) - Circuit Court for the State of Tennessee, 28th Judicial District, Haywood County, Case No. 3594, a class action suit hereinafter referred to as "*Baggett*".

5. *Tracy Price v. Takata Corp., U.S. Testing Company, Inc., et al.*, (Texas) – United State District Court, Northern District of Texas, Amarillo Division, Case No. 2:08-CV-151-J. Originally filed in New Mexico, removed to Federal Court in Texas, a personal injury case hereinafter referred to as "*Price*".

6. *Pete Everett and Marcella Everett, et al., v TK-Taito, LLC, Takata Seat Belts, Inc, et al.* (Texas) - 30th Judicial District Court of Wichita County, Texas, Case No 157,896A, a class action suit hereinafter referred to as "*Everett*".

7. *Mary Stevic and Ronald Stevic v. Nissan Motor Company, Ltd., TK Holdings, Inc. aka Takata Seat Belts, Inc, et al* (Florida) - Ninth Judicial Circuit in Orange County, Florida, Case No. 06-CA-8631, hereinafter referred to as "*Stevic*".

(*See* Complaint (ECF no. 1) ¶ 11)

3      *SGS U.S. Testing Co., Inc. v. Takata Corp.*, No. 09-6007 (KM), 2016 WL 1382364 (D.N.J. Apr. 6, 2016).

I.   **Claims Asserted in the Lawsuits**

As a starting point, it is helpful to summarize the claims made in the seven Lawsuits.

| CAUSES OF ACTION ALLEGED IN COMPLAINT | | | | |
|---|---|---|---|---|
| | Against SGS only | Against Takata only | Against both SGS and Takata | Outcome |
| **Zavala**<br><br>(Compl., ECF no. 121-8, Ex. E; Am. Compl., ECF no. 121-9, Ex. F) | | | • Fraud/fraudulent concealment<br>• Violation of California Business and Professions Code §§ 17203, 17204 [*Note: Several theories are alleged. SGS is implicated in two: false certification of compliance with safety standards, and suppression of information about safety problems.*]<br>• Unjust enrichment<br>• Breach of warranty (alleging SGS breached through conspiracy with Takata)<br>• Consumer Legal Remedies Act, CA Civil Code § 1750, *et seq.* [*Note: Amended Cplt. only*] | Bench trial/Verdict for defendants. The court did not reach SGS's affirmative defenses. |
| **Bagget**<br><br>(Compl. ECF no. 121-12, Ex. I) | | | • Tennessee Consumer Protection Act [*Note: Several theories are alleged. SGS is implicated in one: false certification of compliance with safety standards.*] | Voluntarily dismissed by plaintiff |
| **Price**<br><br>(*See* Compl., ECF no. 121-14, Ex. K) | | • Strict product liability<br>• Strict liability— failure to warn<br>• Breach of express and implied warranties | • Negligence<br>• Violation of the New Mexico Unfair Trade Practices Act<br>• Strict products liability– misrepresentation<br>• Punitive damages | Dismissed before trial as to SGS (unopposed). Trial verdict in favor of Takata |

3

| **Fernandez**<br><br>(Compl., ECF no. 121-10, Ex. G; Am. Compl., ECF no. 121-11, Ex. H) | • Fraudulent concealment<br>• Consumer fraud, A.R.S. § 44-1522<br>• Punitive damages<br>• Unjust enrichment [dropped from Amended Cplt.]<br>• Constructive trust [dropped from Amended Cplt.] | | *[Note: The complaint was originally brought against both Takata and SGS in 2002. Takata was dropped from the Amended Complaint in 2006.]* | Initial dismissal reversed on appeal, but again voluntarily dismissed on remand |
| **Lohman**<br><br>(Compl., ECF no. 121-13, Ex. J) | • Fraudulent concealment<br>• Violation of the New Mexico Unfair Trade Practices Act<br>• Unjust enrichment<br>• Punitive damages | | *[Note: Although Takata was named as a party, it was never served.]* | SGS motion for summary judgment granted. Case then dismissed for want of prosecution |
| **Stevic**<br><br>(Compl., ECF no. 121-15, Ex. L) | | • Strict liability<br>• Strict liability—failure to warn<br>• Negligence | | Settled |
| **Everett**<br><br>(Compl., ECF no. 121-16, Ex. M) | | • Fraudulent concealment<br>• Violation of the Texas Deceptive Trade Practices Act<br>• Unjust enrichment<br>• Constructive trust | | Dismissed for lack of standing |

## II.    The "Active Negligence" Apportionment Rule[4]

My April 6, 2016 opinion set forth the rule governing apportionment of costs under the indemnity contracts between Takata and SGS: SGS may in general recover costs incurred in defending against the Lawsuits, including reasonable legal costs. Pursuant to New Jersey case law, however, it may not recover the "costs of rebutting charges of its own 'active negligence'"[5] *SGS U.S. Testing Co., Inc.*, 2016 WL 1382364, at *11. This "active negligence" rule "looks, not to the outcome of the case . . . , but to the nature of the claims ('charges') that the indemnitee was rebutting." *Id.* at *7. Therefore, "the 'charges' or allegations [must] be sorted in order to apportion liability for costs." *Id.* at *9. As the indemnitee, SGS "bears the burden of persuasion on the allocation or apportionment." *Cent. Motor Parts Corp. v. E.I. duPont deNemours & Co.*, 251 N.J. Super. 5, 12, 596 A.2d 759, 762 (App. Div. 1991).

The governing legal principle is that a party cannot be indemnified for its own fault. *See Central Motor Parts Corp. v. E.I. duPont deNemours & Co.*, 251 N.J. Super. 5, 10, 596 A.2d 759, 762 (App. Div. 1991) ("The bare statement of the rule is that an indemnitee who has defended against allegations of its *independent fault* may not recover its costs." (emphasis added)). Thus the "active negligence" limitation on indemnification is not, I think, confined to actual claims of negligence. The cases surely do not mean to imply, for cution. I finda party may not be indemnified for its negligence, but may be indemnified for purposeful or malicious conduct. In *Piedmont*, on which the

---

[4]    Herein, citations to the parties' submissions are abbreviated as follows:

Memo =    Plaintiff SGS's Supplemental Submission in Support of its Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

Reply =    Defendants' Supplemental Submission in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment

[5]    I refer the reader to my April 6, 2016 opinion, sections III.A.2 and III.A.4, *SGS U.S. Testing Co., Inc.*, 2016 WL 1382364, at *7–8, 10, as well as to the decision of the Third Circuit Court of Appeals, for further explanation, *SGS U.S. Testing Co. v. Takata Corp.*, 547 F. App'x 147, 149 (3d Cir. 2013).

Third Circuit relied in this case, the Supreme Court of Nevada used "active negligence" in that broader sense: "The manufacturer has no duty to defend a distributor or retailer charged with *negligence, breach of warranty, or strict liability* where the latter party is attempting to prove that it was not actively negligent." *Piedmont Equip. Co. v. Eberhard Mfg. Co.*, 99 Nev. 523, 529, 665 P.2d 256, 260 (1983) (emphasis added). In *Central Motor Parts*, on which the Third Circuit also relied, the Appellate Division similarly broadened the scope of "active negligence" to include breach of warranty or other independent fault: "once it is determined, on the above rules, that an indemnitee has defended against *alleged breaches of its own warranties or charges of its independent fault*, the indemnitor is not liable for indemnification for those costs." 251 N.J. Super. at 11–12, 596 A.2d at 762 (emphasis added).

The complaints in the Lawsuits asserted various causes of action, including negligence, fraud, violation of state consumer protection and unfair trade statutes and professional codes, unjust enrichment, strict product liability, and breach of warranty. (*See* Chart, Section I, *supra*.). I look to apportion costs between SGS's defense of claims that SGS acted wrongfully, and costs SGS incurred defending against charges of Takata's fault. In doing so, I am mindful that I am not assessing the merits of the claims (which did not succeed). Nor am I apportioning liability (there is none). Rather, I am enforcing a contract of indemnity as limited by the common law, apportioning between codefendants the cost of defending against these unsuccessful claims.

### III.   Analysis

#### A.   The Parties' Theories

Neither party really proposes a rigorous method of apportionment that convincingly implements the active negligence rule as defined by the Third Circuit and explicated in my prior Opinion. As to *Zavala*, the most expensive of the Lawsuits, SGS concedes that the costs incurred in filing its own answer, defending the depositions of its own witnesses, and the like, representing about 11% of the total, are properly attributed to its defense of itself, and

hence are not reimbursable. SGS suggests, by negative implication, that the remaining 89% of its costs were not incurred in connection with SGS's defense against allegations of its own fault. Takata disagrees; its counterproposal is that SGS bear 100% of its costs. As has become something of a pattern in this case, the parties are talking past each other.

SGS tends to sort the legal fees by task, a method which it regards as a good proxy for a claims-based apportionment. Thus SGS submits that, in the five Lawsuits in which it was a named defendant, only efforts related to "its *own* discovery and its *own* witnesses would proportionately reflect the plaintiff's allegations of 'active negligence' by SGS." (Memo 6) Therefore, SGS proposes that an indemnification award should exclude only fees and costs related to the following tasks: (i) answering complaints, (ii) responding to SGS-directed discovery; (iii) preparing SGS witnesses for trial and depositions; (iv) appearances of witnesses; and (v) expert witnesses hired to testify on technical issues relating to the testing of seat belts. (Memo 6) For block-billed legal fees arising from both pertinent and nonpertinent tasks, SGS proposes that it pay one half. (*Id.* 9) SGS's underlying assumption, then, is that only certain restricted tasks (*e.g.,* depositions of SGS personnel) could have related to its own fault; by definition, anything else must have been a cost of joint defense of allegations of wrongdoing by Takata.[6]

In support of its task-based approach, SGS relies on *Holton v. Altec Industries, Inc.,* Civ. A. No. 90–7905, 1992 WL 26031, at *4 (E.D. Pa. Feb. 11, 1992). There, a truck distributor sought indemnification from its codefendant, a truck manufacturer, for the costs of defending against a personal injury claim. Applying New Jersey law, the court identified the governing principle as this: "where an independent theory of liability against a distributor occasions a portion of the costs of defending against an action, the distributor must bear

---

[6]    Even taken at face value, the theory seems both underinclusive and overinclusive. It is overinclusive because an SGS witness, for example, could have been deposed on subjects having to do solely with Takata's fault. It is underinclusive because (assuming no vicarious liability), any theory of SGS's liability must presume some level of fault.

the risk of loss." *Id.* at \*6. The court determined that the distributor-indemnitee should be responsible only for costs of discovery on the narrow issue of whether the distributor over-sprayed the truck's brake lines with paint; all other costs, said the court, were eligible for indemnification. *Id.* at \*6. The court thus identified the particular theory of negligence that was directed against the conduct of the distributor, and disallowed costs incurred in defending against that theory.

As Takata points out, *Holton* differs from our case because there, the indemnitee was in the chain of distribution. The manufacturer was said to have installed the wrong brake cable in a truck and was clearly alleged to be primarily and strictly liable for the defective product. The distributor, by overspraying paint on the cable, may have possibly contributed to the accident. There was little if any evidence, however, on the paint overspray issue; and indeed both the manufacturer and the plaintiffs were willing to eliminate the distributor and the paint overspray issue from the case. (The distributor remained in the case only because another party vetoed the proposal.) The distributor, in the case primarily because of its position in the distribution chain, was entitled to indemnification for most of what it had laid out, both as to damages and costs:

> The indemnification doctrine is rooted in the theory that where the distributor of the manufacturer's product is exposed to liability merely because of its place in the chain of distribution and not because of any act of wrongdoing on its part, the manufacturer should be made to reimburse the distributor for exposing the distributor to liability for the manufacturer's own wrongful act. *Promaulayko v. Johns Mansville Sales Corporation, Inc.,* 562 A.2d 202, 203 (N.J.1989).

*Holton,* 1992 WL 26031 at \*3. I say "most" because of the active negligence exclusion:

> Moreover, the manufacturer/indemnitor is not liable for indemnification for those costs incurred by a distributor in defense of charges of the distributor's independent fault. [*Central Motor Parts,* 596 A.2d] at 762. "An allocation or apportionment may be required and 'the indemnitee may recover only those fees and

expenses attributable to the making of defenses which are not primarily directed toward rebutting charges of active negligence.'" *Id.* at 762. Those costs incurred in defending claims on which the retailer is found only derivatively or vicariously liable are recoverable. *Id.* at 762 (1991).

In light of the foregoing, the parameters set by the New Jersey courts governing the allocation of defense costs of an indemnitee define the question now before me as whether Elder as distributor/indemnitee was forced to defend this cause of action because of active negligence on its own part or merely because it fell within the chain of distribution from the manufacturer. I then must further inquire to what extent [Distributor] was kept in the suit as a result of any theory of liability existing entirely outside its relationship to [Manufacturer]. To the extent that [Distributor] remained in this case as a jointly liable, but blameless, tortfeasor, [Manufacturer] will be required to reimburse [Distributor]'s costs of defending this action. However, to the extent that [Distributor] was kept in this suit because of allegations of independent fault, [Distributor] will be required to shoulder its own burden of defense.

*Id.*

Under those circumstances, says Takata, the *Holton* court could reasonably conclude that all costs *not* expended on the paint-overspray issue went to the defense of a product liability claim. There, the product liability claim overwhelmingly related to the manufacturer, and was based on the manufacturer's acts. But not so here, says Takata. Turning around the reasoning of *Holton,* Takata asks the court to infer that, because SGS had "no reason" to defend against the product liability claims (which primarily implicated Takata), then it must not have done so. (Reply 4). Takata finds it implausible that SGS would have spent funds for Takata's benefit, and that therefore all costs incurred by SGS must have gone to the defense of claims that SGS was independently at fault. (*See* Reply 7)

I disagree; I do find it plausible that SGS expended resources in the defense of claims involving the fault of Takata. SGS posits that these were all essentially products liability cases against Takata, and that it simply rebutted charges that it had played a minor role in testing the representative samples of the seatbelts. The theories of liability in these cases, however, were not so

9

segregated and confined. The plaintiffs alleged that SGS and Takata acted knowingly and in tandem. In some cases, actual failure of seatbelts was alleged; in others, it was alleged that SGS's certification of compliance led the vehicle manufacturers to ultimately sell vehicles that were not as safe as they were represented to be. In short, it is not so easy to disentangle claims of SGS's fault from claims of Takata's fault.

*Holton* teaches that even a defendant who might ultimately shift liability to another may find itself, rightly or wrongly, in a lawsuit, incurring costs; and it is the cost of defending against claims, not ultimate liability, that is at issue here. Most generally, of course, SGS had a vital interest in obtaining a finding that nothing was wrong with Takata's seatbelts; that would tend to moot any claim of damages arising from SGS's allegedly inadequate testing. A finding of liability against Takata, on the other hand, might have resulted in joint and several liability, whether or not primarily based on SGS's fault. Or it might have given rise to a claim for contribution. Fear of such passive liability, potentially disproportionate to SGS's acts or active negligence, might well have motivated SGS to assist in Takata's defense. More general strategic considerations, too, might have persuaded SGS and Takata that a united front would benefit both. I also accept that SGS naturally would have participated in Takata's general legal defense in several of the Lawsuits. (*See, e.g.,* ECF no. 139-3 (Ex. B1), 139-9 (Ex. D1) (itemized bills for legal services in *Baggett* and *Zavaka* describing participation of SGS counsel in telephone conferences with all defense counsel)).

Takata may be advocating a rule, confined to the facts of *Holton,* that no indemnification is due unless the parties were in the same chain of distribution of a product. If so, that rule would be a poor proxy for the claim-based analysis dictated by the Third Circuit. There is of course a grain of truth in it; to the extent that a party might be passively or vicariously liable simply by virtue of its position in the distribution chain, it would not be defending against a claim of its own, independent fault. But if this simple principle were

dispositive, a great deal of the ink in the Third Circuit's opinion (and mine, on remand) would still be in the inkwell.

### B.   The Court's Allocation

The upshot of all the foregoing is that this Court is presented with two tasks:

(a) to isolate any independent theory of liability asserted against SGS based on its own wrongdoing or fault; and

(b) to suggest a reasonable means of assigning incurred costs to defense against that theory, and exclude such costs from Takata's liability for indemnification.

The parties, although they disagree, have been of some assistance with task (a). They have been less helpful with task (b), but perhaps unavoidably so. The evidence submitted does not rigorously demonstrate what "fees and expenses [are] attributable to the making of defenses . . . primarily directed toward rebutting charges of" SGS's wrongdoing, *i.e.,* its allegedly substandard testing. *SGS U.S. Testing Co. v. Takata Corp.,* 547 F. App'x 147, 149 (3d Cir. 2013) (quoting *Central Motor Parts Corp.,* 596 A.2d at 762). The issues are simply too intertwined.

As to such allocation, then, I find myself in much the same position as the court in *Hales v. Monroe,* 544 F.2d 331 (8th Cir. 1976). There, a supplier and distributor of a stove defended against claims of negligence and strict liability (the negligence theory was withdrawn at trial). They sought indemnity of the costs of defense from the manufacturer. The court found that although the manufacturer might bear ultimate responsibility, the supplier and distributor had been accused of actually knowing that the stove did not work properly after it was installed and converted to propane, but failing to warn the customer. Thus the supplier and distributor asserted defenses to liability that could not have been asserted by the manufacturer; as to those defenses, costs were ineligible for indemnification. *Id.* at 332. But despite the fairly clear division of defenses, the court found that it lacked information sufficient to

11

precisely allocate costs between the two sets of theories, and was forced to make a rough estimate:

> Neither IPS nor Green Colonial attempted to allocate their costs between the defenses on the separate counts. Indeed, we agree that would be difficult to do. Under the circumstances, we find 50% of the amount tendered against the manufacturer to be an equitable adjustment in the award of attorney fees and costs.

*Id.*

Here, the claims and defenses are if anything more interrelated than those in *Hales*. The seatbelts are not alleged to have become defective as a result of anything SGS did; rather, SGS was supposed to test seat belts manufactured by Takata before they were installed in cars and certified to be safety-compliant. Thus the allocation perhaps cannot be calculated precisely. But calculate it I must, using the information that has been placed before me.

### *Zavala*

*Zavala* is the case in which SGS's costs were greatest, allegedly amounting to some $5.1 million. Applying its task-based approach, SGS concludes that 11% of those costs went to rebutting accusations of its own wrongdoing, and seeks indemnification for the remaining 89%. I disagree with the implication that the remaining issues and accusations did not involve any independent wrongdoing by SGS.

The *Zavala* complaint alleged all claims against Takata and SGS jointly. Portmanteau claims of fraud and fraudulent concealment encompassed both alleged acts of Takata vis-à-vis its customers and alleged acts of SGS that misrepresented the testing results of the belts. Takata (and ultimately the vehicle manufacturers) represented that the belts met federal standards, and misleading test results reported by SGS enabled that alleged deception. The two perhaps could have been sued in separate counts. But they are alleged to have acted together, in that SGS allegedly failed to perform tests for the benefit of, with the knowledge and connivance of, and for the purpose of enabling fraud by, Takata. The allegations under the California Business and Professions Code contain several sub-theories directed at Takata, but SGS is

implicated in two: falsely certifying that the seat belt buckles complied with federal standards and suppressing information about safety issues. These claims, too, seem to encompass affirmative wrongful acts of both Takata and SGS, tending toward the same goal. The California Consumer Legal Remedies Act follows the same pattern. Unjust enrichment is asserted against both Takata and SGS, but would seem to relate primarily to Takata vis-à-vis its customers and the purchasers of cars incorporating its products. Breach of warranty, too, would tend primarily to implicate the manufacturer/seller, but in this respect SGS is alleged to have conspired with Takata.

In short, these claims, and the defense of them, cannot neatly be divided. It is fair to say that they incorporate allegations of actual wrongful conduct by SGS. It is also fair to say that they allege actual wrongful conduct by Takata, as manufacturer of the substandard seatbelts, primary perpetrator of the fraud vis-à-vis the vehicle manufacturers, and a knowledgeable promoter of SGS's alleged misrepresentation of the testing results. I therefore do not accept Takata's position that, in joining in with the defense of these counts, SGS was solely defending against accusations of its own, active wrongdoing. Of course, rebutting accusations of misconduct by Takata was probably to SGS's direct or indirect benefit, as discussed above. That is not the same as saying that all of Takata's alleged wrongdoing equates to active wrongdoing by SGS.

In light of the foregoing, I can do no better than to conclude that approximately half of SGS's expenditures related to allegations of its own wrongdoing, and the rest to wrongdoing by Takata. Takata shall indemnify SGS for 50% of the costs SGS incurred in defending the *Zavala* action.

### *Bagget*

In *Bagget*, the plaintiff asserted a single claim under a Tennessee consumer protection statute. The action did not get far; the plaintiff was persuaded to dismiss it voluntarily. The dismissal was not based on the litigation by SGS or Takata of any legal theory specific to itself. Rather, it was based on a decision of the Tennessee Supreme Court that only the state

attorney general had standing to bring a consumer class action under that statute.

Nevertheless, says Takata, the Tennessee state law claim contained two distinct sub-theories: (1) that Takata concealed a defect and (2) that SGS skipped the required partial engagement test. Takata claims that SGS's efforts necessarily were confined to the defense against theory (2), and therefore should not be indemnified. (Reply 8–9) For the reasons stated under *Zavala, supra,* I think that the theories are intertwined and cannot be so neatly divided. Here, as there, I will order Takata to indemnify SGS for 50% of the costs SGS incurred in defending the *Bagget* action.

### Price

*Price* was a personal injury case arising from an automobile accident, rather than a putative class action. Against SGS and Takata jointly, the plaintiff asserted claims of negligence, violation of a state unfair trade practices statute, strict liability (misrepresentation), and punitive damages. As to Takata alone, the plaintiff asserted claims of strict products liability, strict liability (failure to warn), and breach of warranty. SGS participated until shortly before trial, when it was dismissed from the case.[7]

The complaint, to be sure, segregated certain theories and asserted them against Takata alone. As to these, SGS could not be directly liable as a matter of law, and I see no direct evidence that it expended any costs in defending against them.

The remaining theories, as to which SGS did incur costs, were asserted jointly against both defendants. These theories rested on affirmative acts committed by both SGS and Takata; they do not appear to rely on passive or vicarious theories of liability. Particularly as to the pretrial stage (the only stage at which SGS participated), I see no firm basis in the record before me to find

---

[7]     The plaintiff claimed that the seatbelt was defective because it seemed to be latched when in fact it was not. Takata and a codefendant, Honda, went to trial and prevailed on the theory that the plaintiff had not been wearing the seatbelt when the accident occurred. *See Price v. Takata Corp.,* 384 F. App'x 385, 386 (5th Cir. 2010) (finding evidence of plaintiff's drug use, even if error, was harmless).

that SGS incurred costs in discovery or motion practice defending only against its own acts, or only against Takata's acts. In the manner described above, the theories were unavoidably intertwined. Here again, I can do no better than to find that SGS incurred approximately half of its costs defending against allegations of its own, independent fault. I will order Takata to indemnify SGS for 50% of the costs SGS incurred in defending the *Price* action.

### *Fernandez*

For Fernandez, Takata makes similar arguments, which I dispose of in the same manner. Here, however, there is an additional factor. An initial dismissal was reversed on appeal, but on remand the plaintiff voluntarily dismissed all claims against Takata. The plaintiff filed an Amended Complaint in which only SGS was named as defendant. Once the claims against Takata were dismissed on remand, SGS can only have been defending against allegations of independent fault.

I will therefore order Takata to indemnify SGS for 50% of the costs SGS incurred in defending the *Fernandez* action, but only up to the date that Takata was finally dismissed from the action on remand from the Court of Appeals. After that date, SGS's costs are solely its own responsibility.

### *Lohman, Stevic,* and *Everett*

In *Lohman,* issue was never joined as to Takata, which was never served. SGS successfully moved for summary judgment as to all claims brought against itself; thereafter, plaintiff allowed the case to be dismissed for want of prosecution. I therefore find it improbable that SGS would have been defending against anything other than charges of its own independent fault. SGS is wholly responsible for its costs. As to the *Lohman* action, no indemnity is ordered.

*Everett* represents the obverse of *Lohman.* In *Everett,* the parties agree, SGS was not named as a defendant and incurred no costs. As to *Everett,* no indemnity is ordered.

In *Stevic,* SGS was not named as a defendant.[8] SGS has not submitted itemized invoices of work its counsel performed in *Stevic*—rather, there is a general statement of account requesting a lump sum of $28,235.11 (*see* ECF no. 139-2, 29 (Certification of Seth R. Tipton, Esq., Exs. A, F)). SGS has therefore failed to carry its burden that it incurred reasonable costs in *Stevic.* The invoice SGS submits describes only administrative tasks and less than one hour's worth of work by counsel. (*See id.*) SGS also fails to explain why or how it incurred any costs at all in *Stevic,* when in *Everett* (where it was also not named as a defendant), it incurred no costs. Therefore, I find that the $28,235.11 in costs have not been shown to be reasonably or necessarily incurred. As to *Stevic,* no indemnity is ordered.

I have attempted to equitably apportion costs for purposes of indemnification, taking into account the active negligence limitation and the considerations set forth in the parties' supplemental briefing in light of the claims made in each of the Lawsuits. *See Hales, supra.* After doing so, I reviewed the affidavit and legal invoices that SGS submitted with its supplemental memorandum. (*See* ECF no. 139-1 (Certification of Seth R. Tipton, Esq.)) Takata's objections to the amount and nature of the fees and costs billed are somewhat generic, and are also dependent on legal arguments that I have already rejected in this opinion. I do not find that SGS's claimed legal costs were unreasonable.

---

[8]     SGS argues that this weighs in its favor: "It is axiomatic that SGS could not have defended allegations of active negligence because there were no allegations made against SGS in those cases." (Memo 9) This rather begs the question of why, in *Stevic,* SGS incurred any costs at all.

**CONCLUSION**

In my April 6, 2016 order and opinion (ECF nos. 136, 137) the summary judgment motion of Takata (ECF no. 121) was conditionally granted and that of SGS (ECF no. 122) was conditionally denied, subject to the submission of evidence sufficient to permit the court to determine the costs eligible for indemnification. Those supplemental submissions (ECF nos. 139, 140) have been received, and have furnished the court with a sufficient basis to apportion costs for purposes of indemnification. It is therefore ordered that the summary judgment motion of SGS (ECF no. 122) is partially GRANTED, and the motion of Takata (ECF no. 121) is DENIED, to the extent that Takata shall be ordered to indemnify SGS to the extent set forth in the foregoing opinion.

An appropriate Order accompanies this opinion. Within seven days, SGS shall submit a form of judgment, accompanied by a short statement, not to exceed three pages, indicating the basis of the calculation of the dollar amount. Within seven days thereafter, Takata may submit an alternative form of judgment, likewise accompanied by a short statement, not to exceed three pages, indicating the basis of its calculation of the dollar amount. Such statements shall not reargue matters already decided, but shall be confined to the methods of calculation.

Dated: January 26, 2017


KEVIN MCNULTY
United States District Judge